IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| THI OF KANSAS AT HIGHLAND PARK, LLC d/b/a/ TOPEKA COMMUNITY HEALTHCARE CENTER, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 13-2360-JAR-JPO |
| KATHLEEN SEBELIUS, in her official capacity as Secretary, United States Department of Health and Human Services, et al., | ) ) ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM AND ORDER

Plaintiff THI of Kansas at Highland Park, LLC ("THI"), which operates Topeka Community Healthcare Center, seeks injunctive relief to prevent Defendant Kathleen Sebelius, in her official capacity as Secretary of the United States Department of Health and Human Services (the "Secretary"), and Defendant Shawn Sullivan, in his official capacity as Secretary for the Kansas Department for Aging and Disability Services, from terminating THI's Medicare and Medicaid certification and provider agreements on August 12, 2013, before an administrative hearing on the merits of that termination can be conducted. Plaintiff also seeks to enjoin Defendants from appearing at the Topeka Community Healthcare Center facility for the purpose of meeting with the residents and their families to discuss the termination and to enjoin HHS, the Centers for Medicare and Medicaid Services ("CMS"), and the Kansas Department for Aging and Disability Services ("KDADS") from publishing any notice about the termination to

any governmental body, private entity or the general public.  Additionally, Plaintiff seeks to enjoin Defendants Amerigroup Corporation, d/b/a Amerigroup Kansas, Centene Corporation d/b/a Sunflower State Health, and United Healthcare of the Midwest, Inc. from discussing with the residents and/or the residents' families the need for the residents to move or relocate as a result of CMS and KDADS's termination of THI's Medicare and Medicaid certification and provider contracts.

Before the Court is Plaintiff's Motion for Preliminary Injunction (Doc. 4), the Secretary's Motion to Dismiss for Lack of Jurisdiction (Doc. 27); and the KDADS's Motion to Dismiss for Lack of Jurisdiction (Doc. 31).  The Court conducted an evidentiary hearing and heard oral argument on the pending motions on July 25, 2013.  The Court has considered the briefs, the parties' arguments, and the evidence adduced at the hearing and is prepared to rule.  As described more fully below, the Court grants the Defendants' motions to dismiss for lack of jurisdiction.

**I.  Background**

The following facts are alleged in the Verified Complaint or presented at the evidentiary hearing.

Plaintiff THI is the operator of a skilled nursing facility known as Topeka Community Healthcare Center located in Topeka, Kansas; it is licensed by KDADS.  THI has 82 beds and primarily serves elderly individuals who need skilled nursing services.  THI maintains a secured unit of 22 beds to serve individuals with Alzheimer's disease and related dementia.

THI is certified by CMS as a provider under the Medicare Program.  THI has entered into an agreement with CMS to provide skilled nursing services to Medicare Beneficiaries in return for payment for those services under the federal Medicare program.  THI is likewise certified to

participate in the Kansas Medicaid Program. The Medicaid program is administered by KDADS. Eighty-three percent of Plaintiff's revenue is derived from Medicare and Medicaid patients.

THI's participation in the Medicare and Medicaid programs is governed by a complex statutory and regulatory regime. In order to qualify to receive payments under these programs, THI must be certified and in "substantial compliance" with the participation requirements for the programs under federal law.[1] The Secretary of the Department of Health and Human Services ("HHS") is responsible for conducting periodic onsite inspections, termed "surveys," of facilities to determine whether they are in substantial compliance.[2] CMS is a division of HHS and conducts the surveys. HHS also contracts with survey agencies to conduct Medicare and Medicaid surveys on behalf of HHS, including state agency personnel acting as agents of CMS. In Kansas, KDADS is the authorized state agency that surveys skilled nursing facilities on behalf of HHS. The facility is provided with written survey results that include specific instructions for disputing the deficiency findings.

Deficiencies are characterized by scope and severity ratings as follows: (1) deficiencies in substantial compliance (A, B or C); (2) deficiencies that pose no actual harm, with potential for more than minimal harm (D, E or F); (3) deficiencies that constitute actual harm that does not rise to the level of immediate jeopardy (G, H or I); and (4) deficiencies that represent immediate jeopardy to a resident's health and safety (J, K or L).[3] Deficiencies are further classified by

---

[1] *See* 42 U.S.C. §§ 1395i-3, 1396r; 42 C.F.R. §§ 483.1–483.61; *see also* 42 C.F.R. § 488.301.

[2] 42 U.S.C § 13965i-3(h)(2).

[3] 42 C.F.R. § 488.408.

"tags" which range from F150 to F522, each describing a different type of deficiency linked to federal participation requirements.

Where the Secretary determines that a facility's deficiencies pose "immediate jeopardy" to residents' health and safety, applicable law authorizes the Secretary to either appoint temporary management over the facility or terminate the facility's Medicare and Medicaid provider agreement.[4] Where a nursing facility's participation in Medicare and Medicaid will be terminated, federal law entitles the facility to an appeal process that includes a hearing before an Administrative Law Judge ("ALJ"); review of the ALJ decision by the HHS Departmental Appeals Board ("DAB"); and judicial review of the DAB's decision.[5]

THI was designated a "Special Focus Facility," ("SFF") by CMS in September 2010, following a May 27, 2010 survey that noted deficiencies at a level of actual harm to a resident. The SFF program focuses on nursing homes that have a track record of substandard quality of care. When a facility is selected as a SFF, CMS's SFF procedures dictate that the facility receive notice of the designation, which includes notice that

> selection in the program is due to persistent pattern of poor quality on its last three standard surveys and complaints (i.e., three years of compliance history); . . . early termination of the provider agreement may result if significant improvements are not evident within the next four standard surveys (or 24 months, whichever is shorter); . . . The Social Security Act requires termination of the Medicare provider agreement no later than six months unless substantial compliance is achieved (as defined by the statute); and . . . [t]ermination may occur more quickly than the six-month statutory date if serious deficiencies that evidence harm continue.[6]

---

[4]42 U.S.C. § 1395i-3(h)(2)(A)(I).

[5]42 U.S.C. § 1320a-7a(c)(2); 42 C.F.R. §§ 408(g), 498.3(b)(12)–(13).

[6]Defs. Ex. 7, Part II.B.

When a facility receives a SFF designation, the KDADS surveyors must conduct standard surveys twice annually and abbreviated surveys after receiving complaints. In order to graduate from the SFF program, the facility must complete two consecutive standard surveys with no deficiencies cited at a scope and severity of "F" or greater and have no intervening complaints with a scope and severity of "F" or greater.

After eighteen months in the SFF program, facilities are subject to one of three possible outcomes: (1) graduation; (2) an extension of time to correct deficiencies and show that they can achieve and maintain substantial compliance with the Medicare and Medicaid requirements for participation; or (3) termination of the provider agreement.

The facility must submit a plan of correction after a receipt of deficiencies. This is followed by revisits by the surveyors to determine whether the facility is in compliance with the Medicare requirements. Also, within ten days, a facility may dispute survey deficiencies through an informal dispute resolution process.[7] The facility may submit documentation to refute the deficiencies, but there is no right to cross examine witnesses during this process and the facility lacks subpoena power to produce evidence. The dispute is submitted to a panel of three, which must submit a written report of its findings.[8]

---

[7] *See* 42 C.F.R. §§ 488.331 (informal dispute resolution, "IDR"), 488.431 (independent informal dispute resolution, "IIDR"). IIDR involves a dispute over a deficiency involving a civil monetary penalty, and IDR involves disputes over all other penalties.

[8] The panel includes two peer health care providers and one independent panelist. For IDR, the third member can be an employee of KDADS, but cannot have taken part in the disputed survey. For IIDR, the third panelist cannot be employed by KDADS, but can be employed by its umbrella agency. Also, for IIDR, a notice is sent to the Kansas Long Term Care Ombudsman's office and residents are entitled to comment.

KDADS completed the first standard survey of THI as a SFF on February 11, 2011, followed by two annual surveys each year through the May 3, 2013 survey (a total of five standard surveys). KDADS also conducted four abbreviated surveys during that time period, in response to complaints received on the KDADS Hotline. THI participated in the SFF program for thirty-four months. It has been in substantial compliance for a total of twelve of those months, with the longest uninterrupted period of compliance being 122 days. The November 12, 2012 standard survey had no deficiencies cited at a scope and severity of "F" or greater. The next, and most recent, standard survey on May 3, 2013, identified eighteen deficiencies, including facility failures that placed one resident's health and safety in immediate jeopardy. After THI initiated an abatement plan, KDADS found that the immediate jeopardy was abated on May 15, 2013 and revised the scope and severity level to actual harm.

On June 20, 2013, KDADS conducted an abbreviated complaint survey, before the first revisit to address the deficiencies first identified on May 3, 2013. The abbreviated survey identified seven additional deficiencies resulting in actual harm to residents. On June 21, 2013, CMS sent correspondence to THI stating that KDADS's June 20, 2013 survey found that THI was not in compliance with federal participation requirements for nursing homes participating in Medicare and/or Medicaid programs, and that, consequently, "payment for new Medicare and Medicaid admission will be denied July 13, 2013," and THI would also receive imposition of a civil money penalty.

After each survey that identified deficiencies, THI submitted plans of correction, followed by revisits. THI disputed the deficiencies cited in three of the surveys through the IDR process: (1) August 30, 2011 deficiencies resulting in widespread risk of more than minimal

6

harm; (2) June 1, 2012 deficiencies resulting in actual harm to a resident; and (3) the May 3, 2013 deficiencies resulting in actual harm to residents. Each IDR panel upheld the disputed deficiencies.

On July 2, 2013, THI was again informed by CMS that THI did not meet the requirements for participation as a skilled nursing facility under the Medicare program, that a denial of new Medicare and Medicaid admissions would be effectuated July 13, 2013, and that THI's Medicare agreement would be terminated August 12, 2013. That same day, THI was informed by KDADS that because of CMS's findings, THI's Medicaid agreement would also be terminated on August 12, 2013.

On July 5, 2013, KDADS served THI with a Notice of Intent to Revoke Adult Home Care License. This Notice provided that KDADS was terminating THI's license for failure to comply with the requirements for participation in the Medicare and Medicaid Programs and due to CMS's revocation of THI's Medicare participation agreement.

On July 8, 2013, THI submitted a plan of correction asking CMS for the opportunity to demonstrate compliance with requirements for Medicare and Medicaid. But the request was denied in a letter from CMS that same day, and THI was again notified that termination of the Medicare provider agreement would proceed as scheduled. THI appealed the remedies imposed with the Civil Remedies Division of HHS's Department Appeals Board ("DAB"). On July 10, 2013, THI filed a request with the DAB to expedite its appeal.

On July 16, 2013, THI appealed KDADS' Notice of Intent to Revoke Adult Care License, and THI also appealed the termination of its Medicaid provider agreement and requested an expedited review.

Defendants have contacted THI's residents and their families, instructing them that they must move or relocate as a result of CMS and KDADS's termination of THI's Medicare and Medicaid certification and provider contracts. Many patients have relocated and staff have started to look for work elsewhere. As of July 22, THI had forty-three occupants, or 3% of the total beds in Topeka nursing homes that provide skilled nursing services to the aged and disabled, including those with Alzheimer's disease, dementia, and specialized mental health needs. Medicare and Medicaid reimbursement constitutes 83% of THI's gross revenue. If the remedies imposed by HHS and KDADS go into effect on August 12, 2013, THI will have no patients or staff remaining by mid-August or early September and its facility in Topeka will no longer be viable—its doors will close.

After filing its administrative appeal, THI filed the instant action. The Verified Complaint alleges three counts: (1) Injunctive Relief, based on the violation of Plaintiff's procedural due process rights; (2) Invalidity of Agency Action under 5 U.S.C. § 706; and (3) Injunctive Relief Pending Agency Review. The prayer for relief seeks a declaratory judgment that the immediate jeopardy deficiencies identified in the CMS surveys did not place THI residents in immediate jeopardy and that Defendants are not entitled to terminate THI's participation in the Medicaid program. At the July 25, 2013 hearing, Plaintiff orally withdrew all claims asserted in the Verified Complaint except for the procedural due process claim. It insists that it seeks only to preserve the status quo until it exhausts its administrative review and obtains any subsequent judicial review of that process.

## II.    Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction and, as such, must have a statutory or constitutional basis to exercise jurisdiction.[9] A court lacking jurisdiction must dismiss the case, regardless of the stage of the proceeding, when it becomes apparent that jurisdiction is lacking.[10] The party who seeks to invoke federal jurisdiction bears the burden of establishing that such jurisdiction is proper.[11] "Thus, plaintiff bears the burden of showing why the case should not be dismissed."[12] Mere conclusory allegations of jurisdiction are not enough.[13]

The Medicare Act incorporates two key provisions of the Social Security Act dealing with judicial review of agency actions. 42 U.S.C. § 1395cc(b)(2) provides that, after the Secretary has determined that a Medicare provider fails to comply substantially with provisions of its provider agreement, or with certain provisions of the Medicare Act or its regulations, the Secretary may terminate the provider agreement. 42 U.S.C. § 1395cc(h)(1)(A), in turn, provides that an institution dissatisfied with a determination made by the Secretary under § 1395cc(b)(2) is entitled to a hearing to the same extent as provided in 42 U.S.C. § 405(b), "and to judicial review of the Secretary's final decision after such hearing as provided in § 405(g)."

---

[9] *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002); *see United States v. Hardage*, 58 F.3d 569, 574 (10th Cir. 1995) ("Federal courts have limited jurisdiction, and they are not omnipotent. They draw their jurisdiction from the powers specifically granted by Congress, and the Constitution, Article III, Section 2, Clause 1.") (internal citations omitted).

[10] *Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995).

[11] *Montoya*, 296 F.3d at 955.

[12] *Harms v. IRS*, 146 F. Supp. 2d 1128, 1130 (D. Kan. 2001).

[13] *United States ex rel. Hafter, D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir. 1999).

Section 405(g) provides for a strict administrative exhaustion requirement as a prerequisite to judicial review:

> Any individual, after any final decision of [the Secretary] made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision. . . . The findings of [the Secretary] as to any fact, if supported by substantial evidence, shall be conclusive . . . . The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions.

The second key judicial review provision of the Social Security Act incorporated in the Medicare Act is 42 U.S.C. § 405(h). The Medicare Act, at 42 U.S.C. § 1395(ii), provides that the provisions of § 405(h) "shall also apply with respect to this subchapter [Medicare] to the same extent as they are applicable with respect to subchapter 11 [Social Security]." Section 405(h) provides:

> The findings and decision of the [Secretary] after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the [Secretary] shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

The second sentence of § 405(h) thus precludes judicial review of the Secretary's determinations under the Medicare Act pursuant to § 405(g) unless its exhaustion requirements are met. The third sentence forecloses alternative routes of review under federal question jurisdiction or jurisdiction based on the United States' status as a defendant.

Defendants move to dismiss for lack of subject matter jurisdiction. These motions present the jurisdictional issue of whether an exception applies to the administrative channeling

requirements set forth above where a Medicare/Medicaid provider is unable to achieve administrative review prior to the Secretary terminating its provider agreements, when the termination effectively closes that provider's business. Plaintiff argues that jurisdiction lies on two grounds: (1) the so-called *Michigan Acadamy* exception, because it is effectively subject to "no review at all" if not permitted to a pre-termination review; and (2) because it presents a colorable constitutional claim in this case that is entirely collateral to the claim presented to the Secretary, and requiring it to wait for a post-deprivation hearing would cause damage that could not be repaired through retroactive benefit payments.[14] The Court addresses each in turn.

### A. *The Michigan Academy Exception*

The Supreme Court has determined that Congress intended an exception to the administrative channeling requirement in § 405(h), "where it would not simply channel review through the agency, but would mean no review at all."[15] While acknowledging, as it must, that it is entitled to post-termination review in this case, Plaintiff argues that as a practical matter it is entitled to no review at all since its business will no longer be viable once the provider

---

[14]Plaintiff argues in the motion for preliminary injunction that jurisdiction also arises under the All Writs Act, 28 U.S.C. § 1651. But the All Writs Act does not provide an independent basis for jurisdiction, sufficient to defeat the requirements of the Medicare Act and Social Security Act. *See Clinton v. Goldsmith*, 526 U.S. 529, 534–35 (1999); *Gullickson v. Southwest Airlines Pilots Ass'n*, 87 F.3d 1176 (10th Cir. 1996); *Commercial Sec. Bank v. Walker Bank & Trust Co.*, 456 F.2d 1352, 1355 (10th Cir. 1972). Plaintiff also argues that the Court should follow a 1996 decision by the District Court for the District of Columbia that enjoined termination of Medicare and Medicaid payments until an ALJ could render a decision on the administrative claim. *Int'l Long Term Care, Inc. v. Shalala*, 947 F. Supp. 15, 21 (D.D.C. 1996). That Court imposed limited injunctive relief in what it characterized as "an unusual case." *Id.* at 18. Plaintiff's Medicare and Medicaid funding was set to expire the day before the scheduled administrative hearing. Because Plaintiff may have been required to close its doors, the Court found irreparable harm sufficient to justify injunctive relief. *Id.* The court waived the administrative exhaustion requirements under the circumstances but did not perform an analysis under *Mathews v. Eldridge*. This Court is not bound by this decision. Furthermore, the limited holding in that case does not apply here, where no hearing has been set and Plaintiff requests much broader injunctive relief.

[15]*Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 19 (2000) (construing *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667 (1986)).

11

agreements terminate. Defendants urge that the *Michigan Academy* exception only applies in cases where there is no opportunity for *any* judicial review. Because Plaintiff is entitled to post-deprivation review, Defendants maintain that this exception does not apply.

The Court agrees with Defendants that the *Michigan Academy* exception does not apply here. Plaintiff argues that the *Illinois Council* analysis is a practical inquiry—the fact that it is guaranteed to close its doors as a result of CMS's decision means that it could not obtain any meaningful review if it is not provided a pre-termination review.[16] To be sure, the delay-related harm in this case will cause this nursing facility to close, as almost all of its patients are covered by Medicare or Medicaid. But the cases applying this exception since *Illinois Council* was decided in 2000, make clear that its application does not depend on the timing of judicial review, but whether the Plaintiff is entitled to "no review at all."[17] *Illinois Council* acknowledged that the delay involved in channeling "virtually all" claims through the agency comes at a price, "namely, occasional delay-related hardship," but explained that in the context of a massive health and safety program such as Medicare, "this price may seem justified."[18] The Court has

---

[16]This argument conflates the analysis under the *Michigan Academy* exception with the question of whether the Court can deem waived the procedural steps in § 405(g) under *Mathews v. Eldridge*. This latter analysis is addressed in the next section.

[17]*See, e.g.*, *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 659 (5th Cir. 2012) (finding that financial hardship to Plaintiffs in pursuing agency claim is no more than a delay- related hardship); *Cathedral Rock of N. Coll. Hill, Inc. v. Shalala*, 223 F.3d 354, 360–61 (6th Cir. 2000) ("where the Secretary terminates a provider's agreement to participate in the Medicare program for failure to comply substantially with the agreement or the Medicare regulations, the provider is entitled to a hearing and then judicial review of the Secretary's final decision after the hearing. . . . Application of § 1395ii and § 405(h) in this case will not prevent judicial review altogether; Beechknoll simply must exhaust its administrative remedies before this review can take place. Therefore, we conclude that the Michigan Academy exception is not applicable in this case."); *Council for Urological Interests v. Sebelius*, 668 F.3d 704, 712 (D.C. Cir. 2011) (finding the exception applied to a category of affected parties who could not seek administrative review as providers, where third parties could not bring a claim on their behalf).

[18]*Ill. Council*, 529 U.S. at 13.

consistently drawn a distinction between "a total preclusion of review and postponement of review."[19]

Moreover, the exception is not intended to remedy isolated delay-related cost and inconvenience, but is instead intended to deal with hardship likely found in many cases based on how the statute applies generally, resulting in a complete denial of judicial review:

> [W]e do not hold that an individual party could circumvent § 1395ii's channeling requirement simply because that party shows that postponement would mean added inconvenience or cost in an isolated, particular case. Rather, the question is whether, as applied generally to those covered by a particular statutory provision, hardship likely found in many cases turns what appears to be simply a channeling requirement into complete preclusion of judicial review. Of course, individual hardship may be mitigated in a different way, namely, through excusing a number of the steps in the agency process, though not the step of presentment of the matter to the agency. But again, the Council has not shown anything other than potentially isolated instances of the inconveniences sometimes associated with the postponement of judicial review.[20]

Plaintiff has not made a showing here that the statute generally applies to foreclose judicial review to a category of parties or claims, instead focusing exclusively on the specific financial inconvenience to THI if it is not provided a hearing prior to termination of its Medicare provider

---

[19]*Id.* at 19–20 (declining to apply a presumption in favor of preenforcement review); *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975) (distinguishing § 405(h), which extends to "any action" seeking to recover under the Social Security Act, and 38 U.S.C. § 211(a), where there was a complete preclusion of judicial review); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 2007 n.8 (1994) (explaining that presumption against preclusion of review does not apply to a provision that delays judicial review of final agency actions).

[20]*Id.* at 22–23. Whether individual harm should be mitigated through waiver of the remaining administrative exhaustion requirements is addressed in the next section. For example, the in *Council for Urological Interests v. Sebelius*, the court found that an entire category of certain third parties lacked standing under the statute to bring an administrative claim and there was no sufficient proxy to bring an administrative claim on their behalf. In that case, the exception applied because this category of third parties had no judicial review at all. 668 F.3d at 712.

agreement. Because Plaintiff is explicitly entitled to judicial review of the agency's decision to terminate its Medicare provider agreement, and because the harm to Plaintiff constitutes an isolated, delay-related harm, the *Michigan Academy* exception does not apply.

### B. *"Entirely Collateral" Basis for Exercising Jurisdiction*

*Mathews v. Eldridge*[21] does not provide an exception to the administrative exhaustion requirement, but instead prescribes when a Court should waive some of the exhaustion requirements under § 405(g).[22] The Court explained that there are waivable and nonwaivable components to the requirement under § 405(g) that an individual present her claim to an agency before seeking judicial review:

> The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted. The nonwaivable element is the requirement that a claim . . . shall have been presented to the Secretary. Absent such a claim there can be no "decision" of any type. And some decision by the Secretary is clearly required by the statute.[23]

The Court went onto hold that the exhaustion requirement should be waived where the plaintiff raises at least a colorable claim that is entirely collateral to its substantive claim and that an "erroneous termination would damage him in a way not recompensable through retroactive payments."[24]

---

[21]424 U.S. 319 (1976).

[22]*Id.* at 330.

[23]*Id.* at 329.

[24]*Id.* at 331.

14

As in *Eldridge*, Plaintiff in this case has fulfilled the nonwaivable element of administrative exhaustion—it has presented its appeal of the termination decision to the Secretary—so the Court must determine if the remaining steps of administration exhaustion required in § 405(g) should be waived. In order to waive the administrative exhaustion requirements, the Court must first find that the claims Plaintiff asserts in this case are "entirely collateral" to his claim before the ALJ. Second, the Court must find that Plaintiff raises at least a colorable constitutional claim and that requiring it to wait for a post-deprivation hearing would cause it damage that could not be repaired through a favorable determination by the Secretary.

As to the first issue, the Court questions whether this case is properly characterized as "entirely collateral" to the administrative action. The Complaint, which technically has not been amended, asserts a procedural due process claim, but also seeks declaratory relief that the determination by the Secretary to terminate the Medicare and Medicaid provider agreements was in error. On its face, the Complaint asserts claims that are one and the same as the claims presented to the Secretary.[25] But for purposes of determining this issue of jurisdiction, the Court will assume that Plaintiff's oral statements at the hearing, withdrawing all claims but the claim for injunctive relief, validly amended the pleading so that only a constitutional claim for violation of its procedural due process rights remains.

Assuming Plaintiff's claim in this case is confined to a due process challenge, seeking injunctive relief on the grounds that it is entitled to a pre-termination hearing, it is "entirely

---

[25] *See Cathedral Rock*, , 223 F.3d at 363 (explaining that the claims must be completely separate from the claim that the plaintiff is entitled to benefits or continued participation in the Medicare program; if they are "inextricably intertwined" with the claim on the merits for benefits or participation, they are not entirely collateral).

15

collateral" from its substantive challenge to the Secretary's termination decision. Rather than asking this Court to rule on the merits of the termination decision itself, Plaintiff asks that the Court preserve the status quo while it pursues its administrative remedies and any subsequent judicial review.[26] The claims are not inextricably intertwined, so Plaintiff has met the first step and the Court proceeds to consider whether Plaintiff has made a colorable constitutional claim that full relief would not be possible if it was awarded retroactive relief through a post-termination hearing.

Plaintiff maintains that it asserts a colorable constitutional claim and that post-termination review will not be able to grant it full relief. It urges that it will lose its facility and residents by the time a post-deprivation hearing occurs because almost all of its revenue depends on its Medicare certification and provider agreements. The devastating financial impact of the Secretary's termination decision is undisputed by the parties in this case. Even if Plaintiff obtains full relief through post-deprivation review, it would be too late for its business to survive.

While the Court agrees that Plaintiff has clearly shown that postdeprivation review would not grant it full relief, the real issue is whether it asserts a "colorable" constitutional claim that it was not afforded procedural due process, entitling it to pre-termination review. To determine whether the procedures in this case satisfy due process standards, the Court is to consider: (1)

---

[26]*Compare Trade Around the World of Pa. v. Shalala*, 145 F. Supp. 2d 653, 664 (W.D. Pa. 2001) (finding due process claim is not entirely collateral where it seeks a finding that the defendant exceeded its authority in terminating provider agreements without a finding of immediate jeopardy), *with GOS Operator, LLC v. Sebelius*, 843 F. Supp. 2d 1218, 1231 (S.D. Ala. 2012) (finding due process claim entirely collateral where plaintiff sought to preserve the status quo until an ALJ and DAB could decide the administrative claims).

"the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."[27] The overwhelming majority of circuit courts of appeals, including the Tenth Circuit, have determined that Medicare providers enjoy no constitutional right to a pre-termination hearing.[28] This Court follows the analysis of the Tenth Circuit and others in concluding that the *Mathews v. Eldridge* factors do not require a pre-termination hearing for a Medicare provider.

Under the first factor, THI's interest is not particularly compelling, because the Medicare provider is not the intended beneficiary of the program; its "'financial need to be subsidized for the care of its Medicare patients is only incidental to the purpose and design of the Medicare program.'"[29]

Under the second factor, the risk of erroneous deprivation is not high because THI has received extensive process up to this point. Over an almost three-year period, THI was subject to nine surveys by neutral surveyors, with sometimes several revisits after each survey to

---

[27]*Mathews*, 424 U.S. at 335.

[28]*Geriatrics, Inc. v. Harris*, 640 F.2d 262, 265 (10th Cir. 1981); *see Town Court Nursing Ctr. v. Beal*, 586 F.2d 266 (3d Cir. 1978) (en banc), *rev'd on other grounds sub nom. O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773 (1980); *Ritter v. Cohen*, 797 F.2d 119 (3d Cir. 1986); *Cassim v. Bowen*, 824 F.2d 791 (9th Cir. 1987); *Northlake Comm'y Hosp. v. United States*, 654 F.2d 1234, 1241–43 (7th Cir. 1981); *Varandani v. Bowen*, 824 F.2d 307, 310 (4th Cir. 1987); *Cathedral Rock*, 223 F.3d at 364–65.

[29]*Cathedral Rock*, 223 F.3d at 365 (quoting *Northlake Comm'y Hosp.*, 654 F.2d at 1242).

17

determine if the deficiencies had been corrected. THI disputed three of the survey findings through the informal dispute resolution process, during which it could submit written materials. THI also submitted several corrective action plans after deficiencies were discovered. THI was provided with notice at the time it was designated a SFF that termination of its provider contracts would result if it did not qualify to graduate from the program or obtain an extension of time to remedy deficiencies. The Court finds that THI received considerable process and that an additional requirement of a pre-termination hearing is not required by the due process clause to preserve its weak interest in continuing to be subsidized for the care of Medicare and Medicaid patients.

Finally, under the third factor, the Court finds that the Government's interest in expediting the termination process under these circumstances is very strong. The statutory and regulatory scheme at issue is designed to protect "the safety and care of elderly and disabled Medicare patients" and to minimize "the expenses of administering the Medicare program."[30] The SFF program's purpose is to address quality of life and quality of care issues in nursing facilities that have a track record of substandard care. Designation as a SFF allows for more frequent surveys and progressive enforcement. The Secretary's decision to terminate Plaintiff's provider agreements and certifications is not based on an isolated deficiency, but on numerous, sustained deficiencies while in a program targeted toward facilities that already have a history of substandard care. The termination decision was made after THI had been in the program for

---

[30]*Cathedral Rock*, 223 F.3d at 365 (quoting *Northlake Comm'y Hosp.*, 654 F.2d at 1241–43); *see also Bristol Health Care Investors, LLC.,* 2013 WL 2403299, at *10; *GOS Operator, LLC v. Sebelius*, 843 F. Supp. 2d 1218, 1240 (S.D. Ala. 2012).

18

more than two years.  As such, the Government interest in protecting patients through an expeditious provider-termination procedure is quite strong.

The Court finds that Plaintiff does not assert a colorable constitutional claim that it is entitled to a pre-termination hearing in this matter.  Because Plaintiff is not entitled to a waiver of the administrative exhaustion requirement under *Mathews*, the Court lacks jurisdiction to consider the claims presented in the Complaint or in Plaintiff's motion for preliminary injunction.  Even if the Court found Plaintiff's procedural due process claim passed the "at least colorable," threshold and proceeded to consider the motion for preliminary injunction, the Court could not find that Plaintiff had a likelihood of success on the merits of its claim under the analysis set forth above.[31]

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motions to Dismiss for Lack of Jurisdiction (Docs. 27, 31) are **granted**. The Court therefore does not reach the Motion for Preliminary Injunction.  This case is dismissed without prejudice.

Dated: August 9, 2013

          S/ Julie A. Robinson  
          JULIE A. ROBINSON  
          UNITED STATES DISTRICT JUDGE

---

[31]*See, e.g., Schrier v. Univ. of Col.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991)) (setting forth the standards for obtaining a preliminary injunction, including likelihood of success on the merits).  The likelihood of success on the merits analysis would be restricted to likelihood of success on the merits of Plaintiff's procedural due process claim, not on its likelihood of success on the underlying administrative challenge to the Secretary's deficiency findings.